Filed 4/13/21  In re R.K. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.K., a Person Coming Under the Juvenile Court Law. | B305165 (Los Angeles County Super. Ct. No. 18LJJP00130A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. E.S., Defendant and Appellant. | |

APPEAL from a finding and an order of the Superior Court of Los Angeles County.  Steven E. Ipson, Judge Pro Tempore. Affirmed in part, conditionally reversed in part, and remanded with directions.

Karen B. Stalter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Stephanie Jo Reagan, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

E.S. (mother) challenges the juvenile court's order terminating her parental rights to R.K. (minor, born Apr. 2017). (Welf. & Inst. Code, § 366.26.)[1]  She contends that the order must be reversed because (1) the Department of Children and Family Services (DCFS) did not conduct an adequate inquiry into minor's Indian ancestry as required by the Indian Child Welfare Act (ICWA); and (2) the juvenile court's finding at the 12-month review hearing that she had been offered reasonable reunification services is not supported by substantial evidence.  (§ 366.21, subd. (f).)[2]

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]  Ordinarily, this order would not be reviewable at this stage of the appellate proceedings.  However, because the juvenile court failed to orally advise mother of her appellate rights at that time, we can review the issue of the adequacy of reunification services. (See, e.g., *In re Frank R.* (2011) 192 Cal.App.4th 532, 539; *In re Harmony B.* (2005) 125 Cal.App.4th 831, 839.)

2

We conclude that the juvenile court's finding that DCFS provided mother with reasonable reunification services is amply supported by the evidence. As for mother's complaint that DCFS did not comply with the ICWA's inquiry requirements, DCFS concedes that its efforts were deficient. That error compels a limited reversal of the juvenile court's order terminating mother's parental rights. The matter is remanded back to the juvenile court for compliance with the ICWA's inquiry and notice requirements.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Referral*

On February 6, 2018, DCFS received a hotline referral concerning minor. At the time of this referral, DCFS was providing mother with family reunification services for her older child, R.P., whom the juvenile court, in 2016, had found to be at risk due to issues of domestic violence, substance abuse by R.P.'s father (marijuana and prescription drugs), and mother having left R.P. with a friend, without making a plan of care for him.[3]

The hotline referral concerning minor alleged that mother had told the reporting party that she and minor's father, K.K. (father), argued, and then he became enraged, grabbed a knife, and attempted to stab mother five times. DCFS investigated and concluded that minor was in danger, and it secured a removal order. Minor was placed in the home of foster parent, Rachel E. (Rachel).

---

[3] R.P. is not a subject of mother's appeal.

*Section 300 Petition*

On February 22, 2018, DCFS filed a dependency petition with the juvenile court in Lancaster, alleging that minor was a child described by section 300, subdivisions (a), (b)(1), and (j).

*Last Minute Information Report*

For the detention hearing, DCFS submitted a last minute information report. Attached to this report was an ICWA-010 Indian Child Inquiry Attachment form, which had not been included with the dependency petition when it was filed. This form provided that DCFS had made an Indian child inquiry. The form bore a mark in the box that indicated that "The child has no known Indian ancestry." The form further indicated that mother was questioned, and she denied Indian ancestry. However, the form also provided that the paternal grandmother was questioned, and DCFS wrote on the form, "Possible Blackfoot Ancestry."

*Detention Hearing*

For the February 22, 2018, detention hearing, both parents submitted ICWA-020 Parental Notification of Indian Status forms. Both forms reported that they had no known Indian ancestry. Thus, at the hearing, the juvenile court stated: "Both parents have submitted Indian Child Welfare Act statements indicating that, 'I have no American-Indian heritage.' Court will note that the Indian Child Welfare Act does not apply, has no reason to believe that it would apply."

The juvenile court's minute order reiterates: "The Court does not have a reason to know that this is an Indian Child, as defined under ICWA, and does not order notice to any tribe or the [Bureau of Indian Affairs]. Parents are to keep [DCFS], their

4

Attorney and the Court aware of any new information relating to possible ICWA status."

No mention was made of the information provided by the paternal grandmother in DCFS's last minute report.

The juvenile court ordered minor to be detained.

Regarding visitation, the juvenile court ordered monitored visits, to be monitored by any DCFS-approved monitor. It prohibited the parents from visiting together. Furthermore, it authorized DCFS to assess relatives to serve as the parents' visitation monitor. Father's counsel asked the court to specify a minimum number of visits, and the juvenile court responded, "Minimum, two-by-two." The juvenile court's minute order confirms: "Both parents are to have monitored visits for a minimum of 2 hours per visit and 2 visits per week to be limited only to the availability of the monitor with DCFS to have discretion to liberalize."

*Jurisdiction/Disposition Report*

Dependency Investigation

Prior to filing the instant dependency petition, DCFS had opened a voluntary family maintenance case, but mother continued to reside with father, stated she had no intention of leaving him, and did not believe he was a danger to her or to minor.

For R.P.'s case, mother had completed a parenting course, but she had not been consistent in her therapy and although she was permitted twice weekly visits with R.P., she had not been visiting him. Also, mother failed to show for 23 out of 32 drug tests. As for the nine tests for which mother did show, all were negative. DCFS planned to recommend that mother's reunification services in R.P.'s case be terminated.

Regarding the allegations of the instant petition, when mother was interviewed, she stressed that father had never tried to stab her, she had no marks or wounds, and she had not had to go to the hospital.

Further ICWA Inquiry

Although the dependency investigator asked the parents about possible Indian ancestry, when the dependency investigator interviewed the paternal grandmother, she did not ask her about her report of possible "Blackfoot" heritage.

In its report, DCFS wrote: "The Indian Child Welfare Act does not apply. On 2/22/18, the court determine[d] ICWA did not apply and mother and father signed the ICWA 020 forms. On 04/20/18, mother denied any American Indian Ancestry again. On 04/23/18, father denied any American Indian Ancestry."

*Adjudication Hearing*

At the May 8, 2018, adjudication hearing,[4] the juvenile court found count b-3 true as amended[5] and dismissed the remaining counts.

---

[4] The Reporter's Transcript does not include the transcript for this hearing.

[5] As amended, the sustained count b-3 allegation alleged that on February 6, 2018, mother and father "engaged in a violent altercation in the child's presence. The Father grabbed a kitchen knife and threatened the Mother. The Mother failed to protect the child by allowing the father unlimited access to the child. [In addition, R.P. is a current dependent of the juvenile court because of mother's failure to protect him.] Such violent altercation on [the] part of the father against the child's mother and the mother's failure to protect the child endangers the child's

The juvenile court declared minor to be a dependent child of the court and removed her from parental custody. It ordered mother and father to receive family reunification services.

Mother's and father's case plans provided for monitored visits for the parents at least two times a week for two hours, and directed them to not visit together. Mother was required to participate in: A domestic violence support group for victims; individual counseling to address case issues; submit to four random or on-demand drug tests, and if any tests were missed or dirty, then a full drug program with random drug testing.

*Status Review Reports (Oct. 17, 2018, & May 8, 2019)*[6]

On March 27, 2018, mother indicated that she might be moving to Lancaster, and the social worker asked her when she would be moving so that visits could take place there. Mother stated she would let the social worker know once she moved.

Drug testing and other programs

On May 8, 2018, clinical social worker (CSW) Janet Nichols (Nichols) reviewed the requirements of mother's court-ordered case plan with mother over the phone. On May 21, 2018, mother sent a text message to the social worker stating that she had drug tested that day. She wrote, "'1 of the 4 I need.'" However, on June 7, 2018, mother missed a drug test reportedly because she had started a new job. On June 12, 2018, mother sent a

---

physical health and safety, and places the child at risk of serious physical harm and failure to protect."

[6]     For ease and to set forth what occurred in the year following adjudication, we reference portions of both the six-month and 12-month status review reports here.

screen shot of a drug test and wrote, "'2 out of 4.'" The social worker explained to mother that because she had missed her June 7 test, the June 12 drug test would be considered mother's second, not third, drug test. Mother drug tested on June 22, 2018. This and prior two drug tests were negative. Mother, however, failed to show for her next drug test on July 12, 2018, as well as a subsequent drug test on July 25, 2018.

As for her domestic violence program, because mother had indicated that she was moving to Lancaster and could do her programs there, on June 7, 2018, CSW Nichols informed mother that there was a free domestic violence group in Lancaster, and if she did her programs there, she could have an additional weekly visit. Mother responded that she had already identified some programs in Los Angeles. In fact, on June 22, 2018, mother indicated that she was on a wait list for one of these programs. On July 16, 2018, the social worker sent mother a flyer for El Nido Family Centers (El Nido) in Los Angeles, which offered a domestic violence support group and individual counseling. Mother indicated that she would be attending an orientation to enroll in their program.

On July 26, 2018, the social worker discussed with mother the need for her to participate in her court-ordered programs. The social worker stressed the importance of completing her programs because the juvenile court had terminated family reunification services for R.P. based on mother's noncompliance with a domestic violence program or therapy in R.P.'s case. The social worker emphasized that mother had been ordered to do these things in the instant case. Further, the social worker provided mother with information for a mental health facility in Lancaster that accepted walk-in appointments, and explained she

did not need a psychological evaluation, just to enroll in therapy. Regarding drug tests, the social worker reminded mother that she had missed her July 12, 2018, drug test, and, therefore had not completed four consecutive drug tests. The social worker encouraged mother to call nightly for drug testing, and to complete all her court-ordered programs.

Mother, however, missed her next three drug tests, and on August 3, 2018, the social worker reminded mother to call nightly for her drug testing.

As for the requirement for individual counseling, mother stated that she was going to call her former therapist and resume seeing him. Because of mother's plan to move to Lancaster, the social worker texted mother a screen shot of a flyer for a domestic violence program there, and told mother she needed to get started in her programs.

On August 10, 2018, CSW Nichols contacted El Nido requesting proof that the parents had attended their orientation.

Three days later, the social worker met with mother and with father. She reviewed their court-ordered case plans with them and discussed each step and what was needed for minor to be returned to their care. The social worker also reviewed the need to call nightly for drug testing; she reminded mother that she needed to complete four consecutive drug tests, or she would need to complete a drug program. Mother acknowledged her receipt of DCFS referrals and was referred to counseling, drug testing, a drug treatment program, and domestic violence classes.

On August 15, 2018, mother indicated that she planned to see about resuming sessions with her former therapist.

On September 14, 2018, the social worker informed mother that per her request, mother's drug testing site had been moved

to Lancaster.  The social worker also asked mother why she had missed drug tests in July, August, and September, and mother indicated that it was because she would forget to call.  The social worker stressed to mother that she needed to call nightly for her drug testing.

On September 18, 2018, mother called the social worker and asked to submit to a make-up drug test.  The social worker informed mother that she would have to start fresh and submit to four consecutive drug tests.  Mother failed to show for her next drug test.

On September 19, 2018, mother informed the social worker that she had contacted the domestic violence program the social worker had given her.  She was scheduled for an intake interview the following day.

Visitation

DCFS implemented separate weekly visits for the parents in Los Angeles, monitored by a DCFS Human Services Aide.  Mother was late and/or failed to show for some visits, and she often ended the two-hour visits early, sometimes after only 50 to 60 minutes.  Other issues included having to be directed to change minor's diaper, not responding to the social worker to confirm visits, having to be reminded she and father could not visit together, and playing on Facebook and/or Instagram during her visits.

Because of concerns with the parents cancelling visits, the social worker informed both parents that they had to confirm their visits by 5:00 p.m. the evening before the visit.

On September 9, 2018, mother informed the social worker that she and father had broken up and she would be moving to Bakersfield.  The social worker suggested mother visit in

10

Lancaster as it would be closer for mother, but mother stated that she had transportation and wished to continue her visits with minor in Los Angeles.

The following day, the social worker sent reminder texts to mother and father to call the visitation monitor by Tuesday at 5:00 p.m. to confirm their Wednesday, September 12, 2018, visit. Mother confirmed her visit in Los Angeles and asked that future visits be scheduled for Fridays in Lancaster.

On the day of the scheduled and confirmed visit, mother sent a text message indicating that she was coming from Bakersfield and would be late for the visit. Mother was so late that she was able to visit for only 25 minutes.

On September 17, 2018, mother called the social worker and asked about visiting minor. The social worker reminded mother that a visit had been scheduled, per her request, for Friday, September 21, 2018, in Lancaster. On September 20, 2018, mother called and asked to have the September 21, visit rescheduled to Monday, September 23. On Monday, mother indicated that she would be 30 minutes late for the visit. Mother then sent a text message indicating she was cancelling the visit.

On Friday, October 4, 2018, mother informed the social worker that her car had broken down and she asked the social worker to have minor brought to Bakersfield. The social worker informed mother that the social worker would have to request assistance. On October 10, 2018, a DCFS visitation monitor contacted mother and they scheduled a visit for October 17, 2018, in Bakersfield.

However, on October 16, 2018, mother indicated that she would be in Los Angeles on October 17 and asked to have the visit there. Mother then canceled the October 17, 2018, visit.

11

The social worker contacted mother and asked her why she had canceled the visit and changed the location. Mother said that her car had broken down and she was only in Los Angeles visiting and she would be returning to Bakersfield. The social worker discussed with mother having visits in Lancaster for consistency and to save minor from being in a car for five hours.

On October 22, 2018, mother contacted the social worker asking to transfer her drug testing back to Los Angeles. She told the social worker that she would be in Los Angeles for "a while" and would be going to school to become a Certified Nursing Assistant. She did not ask about visiting minor.

On October 30, 2018, mother sent a text message asking when she could resume her visits with minor. The social worker discussed having one visit in Lancaster and then one visit in Los Angeles. The social worker informed mother that she wanted to see some effort on mother's part. Mother said she would try.

DCFS's recommendation

For the six-month status review hearing, DCFS reported that it had provided the parents with referrals and maintained weekly contact with them. It further reported that there appeared to be barriers to the parents successfully enrolling in programs and being consistent with their visits. DCFS recommended that reunification services with minor, who remained placed in the foster home of Rachel, be provided for another six months so that the parents could show progress towards reunification.

As for the ICWA, DCFS reiterated that the ICWA did not apply.

12

*Six-Month Review Hearing*

On November 8, 2018, the court held the six-month status review hearing.[7] It found that the extent of progress made by the parents towards alleviating or mitigating the causes necessitating placement had been minimal. It also found that DCFS had complied with the case plan by providing or offering, or making active efforts to provide or offer, reasonable services to enable the child's safe return home. The juvenile court continued reunification services "for the reasons stated on the record in open court." It ordered DCFS to assist the parents with transportation and to assist in transporting minor to Los Angeles for visitation.

*Status Review Report*[8]

Drug testing and other programs

On the day of the six-month review hearing, CSW Nichols met the parents at the courthouse and could smell the strong odor of marijuana, but she was not certain which parent emitted the odor. The social worker reviewed everything that mother needed to do, including that she still needed to provide four consecutive negative drug tests or enroll in a drug treatment program. Mother stated that she did not use drugs and should not have to complete a drug treatment program.

On November 16, 2018, mother informed the social worker that she had started a new job. She asked if she could complete

---

[7] The Reporter's Transcript does not include the transcript for this hearing.

[8] We reference portions of both the 12-month status review report and subsequent interim review report.

her domestic violence support group for victims on-line.  The social worker advised her that she needed to attend the sessions in person.

On November 18, 2018, a CSW reported there was a very strong smell of marijuana in the parents' car, and the aid observed a lighter and what appeared to be rolling papers in the door handle of the car.  The next day, the social worker asked mother about the status of her drug testing.  Mother claimed that she did not know that she still needed to drug test.  The social worker informed mother she still needed to provide four consecutive negative tests.  She also reminded mother that she needed to be in individual therapy.  Mother stated that she did not need therapy.

As for domestic violence counseling, mother provided documentation showing that she had enrolled in a domestic violence support group and that her first class was scheduled for the following day.  The social worker subsequently contacted the domestic violence program to confirm mother's enrollment and asked for monthly progress letters.

On December 21, 2018, CSW Nichols sent a text message reminding mother she had not provided proof of enrollment in any programs, and that the social worker had not seen any drug testing results.

On December 26, 2018, the social worker communicated with mother by text message and asked her about her individual therapy, her domestic violence support group, and her drug testing.  Mother did not reply.

On January 8, 2019, the social worker sent a text message to mother regarding her monthly bus passes.  The social worker informed mother that she needed to provide proof of enrollment

in programs and to make efforts to visit minor in Lancaster or the social worker would submit a request to terminate mother's bus passes. The social worker did not receive any response from mother.

On February 27, 2019, the maternal grandmother stated that she and mother were moving to Bakersfield.

On March 4, 2019, the social worker sent mother a text message regarding her bus pass and asked her to provide proof of enrollment in programs. Again, mother did not respond.

On March 8, 2019, the social worker asked mother about her drug testing. Although the maternal grandmother had stated they were moving to Bakersfield, mother stated that she wanted her drug testing program to remain in Los Angeles.

On March 19, 2019, the social worker received a progress letter from the domestic violence program. The letter informed that mother had enrolled on February 13, 2019, and attended sessions on February 14 and 21, 2019, and that she needed to complete 18 more sessions to receive a certificate of completion.

On March 27, 2019, the social worker sent a text message to mother asking if she was still attending her domestic violence support group and whether she had enrolled in individual therapy. The social worker also pointed out that mother had not been drug testing. Mother did not reply.

On April 5, 2019, the social worker received a progress letter from mother's domestic violence program indicating that mother had not attended any additional classes. Mother told the social worker that she was back in Bakersfield, had not completed her domestic violence program, had not drug tested, and was not enrolled in individual therapy. The social worker informed mother that there was no progress to report, and,

therefore, DCFS would be asking the juvenile court to terminate family reunification services.

Visitation

On November 8, 2018, CSW Nichols planned to monitor a visit before the court hearing. She was not able to do so because she was called to criminal court, but she was able to meet with the parents to discuss visitation. The social worker informed the parents that as a result of their cancelling, being late, and ending visits early, and the fact that there was no longer a visitation monitor to assist with visits, the parents would need to come to Lancaster every other week to visit and on the alternate weeks the social worker would take minor to Los Angeles. Father complained about the distance to Lancaster, stating it would be two hours each way. The social worker explained that the trip for minor to have a visit in Los Angeles was even longer, up to five hours. Both parents agreed that they would call the social worker and schedule weekly visits. The social worker also asked mother to provide the names of individuals who could be assessed to monitor her visits.

That same day, the social worker advised mother to call her the following week and schedule a visit for Lancaster. There is no indication that mother contacted the social worker to schedule the visit in Lancaster.

On November 28, 2018, mother sent a text message to the social worker asking when she could have visits back in Los Angeles. The social worker stated that she would try to schedule some visits in Los Angeles, but she could no longer provide visits in Los Angeles every week. The social worker suggested having one in Lancaster and then having one in Los Angeles. Mother agreed.

16

On December 5, 2018, mother sent a text message that stated, "'Would we be able to have supervised visits at my mom's house? Also, can visits be done on the weekend? I just want to see my daughter.'" The social worker responded, "'I can try and work that out. But y[o]u and [father] can't visit together. And I'll need to know ahead of time to see if foster [mother] is available to transport.'" Mother responded, "'Ok, that's fine.'"

Meanwhile, on December 7, 2018, mother asked whether minor could be at the maternal grandmother's home for Christmas.[9] The social worker indicated that she was trying to set up a visit for the maternal grandmother and minor. She cautioned mother that the social workers did not work that day, and the foster mother also might not be available.

On December 10, 2018, the social worker sent a text message to the maternal grandmother asking to set up mother's weekly visits, but the social worker did not receive a response.

On December 13, 2018, mother confirmed a visit for December 20, 2018, in Lancaster with the maternal grandmother as the monitor. The maternal grandmother, however, indicated that she knew nothing of the visit and would not be home to monitor it. The visit was therefore canceled by the social worker.

On December 18, 2018, mother confirmed that the maternal grandmother wanted to have minor with her for the holidays. The social worker stated that she would check. She also informed mother she had contacted the maternal grandmother about scheduling weekly visits and reiterated that the maternal grandmother needed to call her. Mother said she would inform the maternal grandmother. The maternal

---

[9]     R.P. had been placed with the maternal grandmother.

17

grandmother later sent the social worker a text message stating that it was "'ok'" to take minor to her house on Christmas day. The social worker replied that she did not work on Christmas day and someone needed to transport minor to the visit, and the social worker was not sure whether the foster mother was available to transport. The social worker suggested they have a Christmas Eve visit.

On December 20, 2020, mother asked again about having minor for Christmas at the maternal grandmother's home. The social worker informed mother that the foster mother and her family would be out of town that day, and the DCFS office was closed on Christmas. The social worker informed mother that she had inquired of the maternal grandmother about having a visit on a different day, but the maternal grandmother did not get back to her.

Mother indicated that she felt as if she were not being allowed to see minor. The social worker stressed to mother that she had specifically asked for a visit on Christmas day, which could not be accommodated because DCFS offices were closed.

The day after Christmas, mother sent the social worker the following text message: "'I want a visit. [I've] been asking for a while. I haven't seen my daughter in 2 months for what reason?'" In response, the social worker informed mother that she needed to make some effort to schedule a visit and see minor in Lancaster, and that the social worker would then try to arrange monthly or biweekly visits in Los Angeles.

On December 27, 2018, mother texted the social worker and asked to have a visit at the maternal grandmother's home on Monday, December 31, 2018. The social worker responded, "'I'm off on Monday and Tuesday. We can call the foster [mother] to

see if she's available.  Have your [mother] call me to schedule a time.  And please try to schedule a little more in advance so that I can plan.'"

On Wednesday, January 2, 2019, mother sent a text message to the social worker asking if she could have a visit the next day at the maternal grandmother's home.  The social worker indicated that she was out of town but would see if the foster mother was available.  The social worker later responded that the foster mother had plans and could not take minor to town, but that both the social worker and the foster mother were available on Friday.  The social worker also suggested scheduling a visit for the following week so they could plan ahead.  Mother stated that she could visit on Friday.  The social worker asked if she needed to monitor the visit, and mother stated that the maternal grandmother was available.  The social worker confirmed the maternal grandmother's availability.

On January 4, 2019, the social worker transported minor to the maternal grandmother's home for a visit.  When the social worker left, mother was playing with minor.  When the social worker returned to pick up the child, the maternal grandmother and mother indicated that the visit had gone well.

On January 25, 2019, mother sent a text message asking for another visit.  The social worker confirmed a visit for January 31, 2019, at the maternal grandmother's home.  That day, the social worker submitted a request for a DCFS Human Services Aide to monitor visits once a month in Los Angeles, and an aide was assigned on February 12, 2019.

On January 30, 2019, father sent a message stating he and mother would be together for their visit the following day; mother sent a text message stating that the maternal grandmother

would not be in Lancaster and mother was not certain who would be at the home to monitor the visit. The social worker indicated that she could not leave minor if there was no monitor, and the social worker canceled the visit.

On February 5, 2019, the social worker informed mother that a visitation monitor would be available beginning on February 12 to monitor visits in Los Angeles.

On February 12, 2019, the Human Services Aide monitored a one-hour visit for mother in Los Angeles at a library.

On March 6, 2019, mother sent a text message to the social worker asking to schedule a visit with minor. The social worker responded that the Human Services Aide would be transporting minor to Los Angeles on Tuesday, March 12. The social worker asked mother if she wanted to schedule another visit following the Los Angeles visit. Mother stated that she would love another visit. She said she was in Bakersfield and would be going to her mother's home in Lancaster. The social worker checked her schedule and informed mother she was not available to monitor a visit until April 3, 2019.

Meanwhile, on March 8, 2019, the social worker sent mother a text message reminding her to confirm her March 12, 2019, visit with a DCFS Human Service Aide, and, on March 12, 2019, the aide monitored a visit for mother in Los Angeles.

On March 30, 2019, mother asked if she could have minor for the child's second birthday. The social worker scheduled a visit at Chuck E. Cheese restaurant in Lancaster for April 11, 2019. On April 10, 2019, mother canceled the visit, stating that she did not have transportation from Bakersfield, as the maternal grandmother was not there to take her to Lancaster.

On April 26, 2019, mother asked to have minor for the maternal grandmother's wedding. The social worker did not allow the visit because of concerns that the maternal grandmother would not be able to provide adequate monitoring during her wedding.

DCFS's recommendation

DCFS concluded that mother had made minimal efforts towards reunification. Thus, it recommended that the juvenile court terminate reunification services.

As for the ICWA, DCFS reiterated that it did not apply.

*12-Month Status Review Hearing*

The 12-month status review scheduled for May 8, 2019,[10] was continued to July 2, 2019, for a contested hearing. The juvenile court ordered the DCFS social worker to be on call, ordered DCFS to provide its service logs from November 8, 2018, to June 26, 2019, and ordered DCFS to prepare a supplemental report to address the parents' "further progress and visitation and any change in recommendation." It also ordered transportation assistance for the parents, and for DCFS "to make [its] best efforts to facilitate transport of the minor to the Los Angeles area for visits." Minor was present that day, and the social worker monitored a visit for both parents.

---

[10] The Reporter's Transcript does not include the transcript for this hearing.

21

*Supplemental Report*

DCFS reported that mother had been called to five additional tests, and that she had failed to show for a single test. She also provided no proof that she had enrolled in any programs.

DCFS reported that between the date of detention and the November 8, 2018, six-month status review hearing, the social worker provided the parents with weekly visitation in Los Angeles; the parents were late to these visits, left early, and sometimes canceled, including once when minor was en route to the visit. DCFS further reported that after the six-month review hearing, to prevent minor from being in the car for five hours, and because there was no visitation monitor to assist with visits, the social worker discussed alternating visits between Lancaster and Los Angeles. The social worker indicated that she had submitted a request for a visitation monitor to assist in monitoring visits in the Los Angeles area, and DCFS assigned a worker to monitor one visit per month in Los Angeles.

As for the Lancaster visits, the social worker reported that both parents were aware that they could have visits in Lancaster by calling and providing advance notice. The social worker stated that mother's visits in Lancaster had been sporadic and inconsistent. The social worker also noted that she had informed the parents about calling to check in on minor, but neither parent had called the foster mother to inquire about minor since her detention.

DCFS reiterated its recommendation to terminate family reunification services.

*Contested 12-Month Status Review Hearing*

At the July 2, 2019, hearing, the juvenile court admitted DCFS's reports and delivered service logs into evidence without

objection. No other party offered any evidence, and the parties did not call witnesses or object to the adequacy of DCFS's reports.

Mother's counsel objected to DCFS's recommendation to terminate family reunification services, stating: "It's mother's position that she was not provided the reasonable services, including that she was not provided with free-to-low-cost domestic violence classes, and, thus, she was unable to afford her classes. I am asking the court to extend mother's reunification services to the 18-month period. If the court is not inclined, then it would be over mother's objection. Submitted, your Honor."

Minor's counsel argued that DCFS had provided reasonable services and asked the juvenile court to terminate family reunification services.

DCFS's counsel, among other things, stated: "The parents were given visitation. They were asked to try to come to meet at a medium portion to visit because the child was only two years old, and sitting in a [car for] two hours to get to L.A. was not fair to the child. Nonetheless, agencies were assigned, and the parents were receiving visitation at least—I would say at least two times a month, from my review of this case file."

After entertaining oral argument, the juvenile court stated, "[A]s far as what the parents have done and what they were ordered to do, the mother had been ordered to do domestic violence support group for victims, random and on demand consecutive drug tests, [and] individual counseling." It added that the evidence reflected that the social worker had contacted mother monthly since the last court date regarding programs and court orders and there were additional messages between them.

The juvenile court observed that mother had not provided proof of participation in programs or proof of drug testing. It

noted that it appeared that mother had attended a domestic violence program at some point, but it was not clear if she had completed it. After discussing father's compliance in his court-ordered case plan, the juvenile court stated: "The parents have had some visits, but they have also been late, missed visits, canceled, left early."

The juvenile court found the conditions justifying jurisdiction remained and that it would be detrimental to minor to return her to parental custody. It further found that DCFS had complied with the case plan by making reasonable efforts to return minor safely to her home. Thus, it terminated reunification services and set the matter for a section 366.26 hearing.

Father's counsel noted that the termination of reunification services was over father's objection. The juvenile court then asked, "And the mother's objection as well?" Mother's counsel responded, "Yes, your Honor." Mother's counsel offered no further response, and counsel did not expound on the objection.

*Writ Notice*

On July 2, 2019, the Clerk of the Court served mother by U.S. mail with notice of her writ rights. Even though mother was present at the 12-month status review hearing, the juvenile court did not orally advise her of her writ rights when it terminated reunification services.

*Section 366.26 Hearing*

On March 5, 2020, the juvenile court conducted the section 366.26 permanency planning hearing. Mother did not appear. The juvenile court received DCFS's reports in evidence. No other evidence was presented.

24

The juvenile court found that the ICWA did not apply. It further found minor likely to be adopted. It also found that the parents had not maintained regular visitation and contact with minor, had not established a bond with her, and that no exception to adoption applied.

The juvenile court terminated mother's and father's parental rights, and designated Rachel as minor's prospective adoptive parent.

*Appeal*

Mother's timely appeal ensued.

## DISCUSSION

I. *Reunification services at the 12-month review hearing*

Mother argues that the juvenile court's finding at the 12-month review hearing[11] that DCFS offered her reasonable reunification services is not supported by substantial evidence.

A. Forfeiture

A parent waives a challenge to the adequacy of reunification services if the parent fails to object on that basis when the juvenile court terminates reunification services. (*In re*

---

[11] When a juvenile court refers a case for a section 366.26 hearing, that order and all ancillary orders are reviewed by way of extraordinary writ upon the filing of a Notice of Intent to File Petition for Extraordinary Writ. (*In re Cathina W.* (1998) 68 Cal.App.4th 716, 719–720; § 366.26, subd. (l)(3)(A); Cal. Rules of Court, rules 8.450, 8.452.) However, the Courts of Appeal have considered the adequacy of the reunification efforts in an appeal from the order terminating parental rights when, as here, the juvenile court failed to advise the parent of the writ requirement. (See Cal. Rules of Court, rule 5.590(b) [rule regarding oral writ advisement]; *In re Cathina W.*, *supra*, 68 Cal.App.4th at pp. 722–725; *In re Rashad B.* (1999) 76 Cal.App.4th 442.)

25

*Lauren Z.* (2008) 158 Cal.App.4th 1102, 1110; see also *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885.) Further, "[g]eneral objections are insufficient to preserve issues for review." (*In re E.A.* (2012) 209 Cal.App.4th 787, 790.)

For the first time on appeal, mother argues that she was not provided with reasonable services because DCFS failed to refer her to a drug program after she failed to provide four consecutive clean drug tests and because it did not facilitate the juvenile court's order for twice-weekly visits. Because mother did not raise these objections below, she has forfeited them on appeal. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 411 [As a general rule, "a party is precluded from urging on appeal any point not raised in the trial court"].)

B. <u>Substantial evidence supports the juvenile court's reasonable efforts finding</u>

For the sake of completeness, we address the merits of mother's argument.

1. *Relevant law*

The juvenile court shall order the social worker to provide child welfare services to the child and the child's mother, statutorily presumed father, or guardian whenever a child has been removed from a parent's or guardian's custody, except as provided in subdivision (b), or when the parent has voluntarily relinquished the child. (§ 361.5, subd. (a).) Court-ordered services may be extended up to a period not to exceed 18 months after the date of the child's initial removal from his parent's or guardian's physical custody. (§ 361.5, subd. (a)(3)(A).)

When family reunification services are ordered, dependency law requires a good faith effort on the part of the social worker to provide reasonable services "responding to the unique needs of

26

each family." (*In re Monica C.* (1995) 31 Cal.App.4th 296, 306.) Such services "must be specifically tailored to fit the circumstances of each family" and "must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding." (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777; see also *Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 599.)

In determining whether DCFS provided reasonable services, the juvenile court must review the status review report and consider parental efforts to utilize the services provided. (§ 366.21, subd. (f).) "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult." (*In re Riva M.*, *supra*, 235 Cal.App.3d at p. 414.)

The adequacy of reunification plans and the reasonable services provided are judged according to the circumstances of each case. (*Armando L. v. Superior Court* (1995) 36 Cal.App.4th 549, 554; *In re Robin V.* (1995) 33 Cal.App.4th 1158, 1164.)

In other words, when a juvenile court makes a reasonable efforts determination, the standard is whether the services were reasonable under the circumstances. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 546.)

We review the juvenile court's reasonable services finding for substantial evidence. (See *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762; *In re Christina A.* (1989) 213 Cal.App.3d 1073, 1080.) We must view the evidence in the light most favorable to DCFS and indulge all legitimate and reasonable

27

inferences to uphold the juvenile court's finding. (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010.)

2. <u>Reasonable services regarding drug treatment</u>

Mother first argues that DCFS did not make a good-faith effort to offer her with reasonable services because it did not provide her with referrals for drug rehabilitation programs even though she missed drug tests. The evidence shows otherwise. On August 13, 2018, mother signed a receipt for referrals from DCFS, and DCFS's same report included copies of various referrals given to the parents. It is true that the appellate record does not include a copy of a referral to a drug treatment program. But, the receipt for referrals signed by mother checked and highlighted "Drug Treatment Program." Viewing this evidence in the light most favorable to DCFS, to the extent the juvenile court found that mother had received a referral to a drug treatment program, we see no basis to disturb it. (*In re Misako R.*, *supra*, 2 Cal.App.4th at p. 545 ["[i]n reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent"].)

Even if the social worker had failed to provide mother with a referral to a drug treatment program, this lone omission does not negate the other efforts made by the social worker to assist mother in complying with the drug services component of her case plan.

As set forth above, the juvenile court ordered mother to provide four consecutive negative drug tests, and if any tests were missed or dirty, to enroll in a drug treatment program. The social worker reviewed this and the other requirements of mother's court-ordered case plan on at least three separate occasions.

When mother missed a drug test in June 2018, the social worker explained that the missed test in June would not count towards the requirement because mother needed to provide four consecutive clean drug tests.

When mother missed another drug test in July 2018, the social worker encouraged mother to call nightly to see if she had been called to drug test the following day. After mother missed her next three drug tests, the social worker contacted mother, reminded her of the drug testing requirement, and urged her to call nightly to see if she was called to drug test to following day.

Indeed, the social worker followed up with mother concerning her missed drug tests in September 2018, twice in December 2018, in February 2019, and in March 2019. Mother, however, failed to drug test, ignored the social worker's communications, and even denied being aware that she was still required to drug test.

Admittedly, the social worker did not demand that mother enter a drug treatment program to address her noncompliance with the juvenile court's drug testing requirement. But given mother's inability to comply with the individual counseling and domestic violence support group requirements of her case plan— for which she was given referrals—it was reasonable for the social worker to focus on encouraging mother to provide four clean consecutive tests, rather than on mother enrolling in a full drug treatment program. In fact, based on mother's demonstrated pattern of behaviors, it could have been unreasonable to believe that mother would have enrolled in a drug treatment program had she been given a referral to one.

In short, the juvenile court's finding that DCFS made a reasonable effort to help mother comply with the drug testing

component of her case plan is supported by substantial evidence. On multiple occasions, the social worker explained the drug testing or drug treatment program requirement to mother, repeatedly encouraged mother to drug test, instructed her to call nightly to see if she was summoned to drug test, and regularly reminded her of the drug testing requirement. There is no basis to reverse.

### 3. Visitation

Second, mother argues that DCFS did not facilitate her court-ordered twice-weekly visits, and for two months received no visits with minor.

The juvenile court's visitation order provided for twice-weekly visits. But its order did not require visits to take place in Los Angeles. Indeed, not until May 8, 2019, the date of the first scheduled 12-month status review hearing, was DCFS obligated to "make best efforts to facilitate transport of the minor to the Los Angeles area for visits."[12]

This case was filed with the juvenile court in Lancaster. Mother desired to have visits in Los Angeles, and the record indicates that following the disposition hearing, DCFS procured a Human Services Aide who transported minor to Los Angeles and monitored the parents' visits weekly in Los Angeles. The social worker also suggested to mother that she enroll in programs in Lancaster so that she could have a second weekly visit after her programs in the Lancaster area. Mother, however, declined the social worker's offer. As such, for the first six-month period,

---

[12] Though DCFS filed a supplemental report on June 25, 2019, it did not address visits subsequent to the juvenile court's May 8, 2019, order.

30

DCFS provided mother with weekly visits in Los Angeles, and it offered her additional weekly visitation in Lancaster.

As of November 8, 2018, the visitation monitor was no longer available. Further, the social worker became concerned that having visits in Los Angeles required minor to be in a car for up to five hours and the parents were often late, left early, and even canceled. Therefore, the social worker required that some visits take place in Lancaster before requiring minor to be transported to Los Angeles. Mother, however, only made limited requests to visit minor in Lancaster.

Even though the social worker informed mother on November 8, 2018, to contact her to schedule a visit in Lancaster, it was nearly three weeks before mother contacted her. And, when mother did so, it was not to schedule a visit in Lancaster, but to again ask about having visits back in Los Angeles.

In fact, mother did not ask the social worker about having a visit in Lancaster until December 5, 2018, nearly a month after the social worker informed mother about visiting in Lancaster. And, at that time, mother asked whether they (presumably mother and father) could have their visits in Lancaster at the maternal grandmother's home, possibly on Saturdays. The social worker reminded mother that she and father could not visit together and contacted the maternal grandmother about arranging such visits, but the maternal grandmother did not respond to set up visits.

Mother did make efforts to secure a Christmas day visit. However, DCFS could not accommodate their request for a Christmas day visit because no one was available to transport minor to the maternal grandmother's home; the social worker did

not work on Christmas day, DCFS's offices were closed, and the foster mother was out of town.

Mother made two additional requests to visit minor that month.  On December 13, 2018, mother asked for a visit and one was scheduled for the following week.  However, no visit went forward because the maternal grandmother knew nothing about the visit.  On Thursday December 27, 2018, mother asked to have a visit on Monday December 31, 2018.  The social worker, however, indicated that she was not working on Monday or Tuesday, but that they could see if the foster mother was available.  The social worker asked mother to have the maternal grandmother call her, but there is no indication in the appellate record whether she ever did.

On January 2, 2019, mother called the social worker and asked to have a visit the following day at the maternal grandmother's home.  Although a visit was not provided on January 3, mother had a monitored visit on January 4, monitored by the maternal grandmother at her home.

Mother did not request another visit until three weeks later, and a visit was scheduled for January 31, 2019.  That visit had to be canceled, however, as the mother had not informed the maternal grandmother that the visit would take place at her home and the maternal grandmother planned to be out of town.

On February 5, 2019, the social worker informed mother that a visitation monitor was now available to monitor visits in Los Angeles beginning on February 12, and mother had a visit with minor in Los Angeles on February 12, 2019.

It is true that on March 6, 2019, mother asked to visit minor, and the social worker informed her the social worker would not be available to monitor a visit in Lancaster until

32

April 3.  However, mother had a visit in Los Angeles on March 12.

On March 30, 2019, mother asked to visit minor for the child's second birthday, and a visit was scheduled for April 11, 2019, at Chuck E. Cheese restaurant in Lancaster.  The day before the visit, mother canceled, stating that she did not have transportation.

On April 26, 2019, mother asked to have minor for the maternal grandmother's wedding.  There were at least two obstacles to this request.  First, the wedding was scheduled for a Saturday, and DCFS was not able to arrange a visitation monitor.  Second, the social worker was concerned that the maternal grandmother would be unable to monitor the visit adequately during her own wedding.

Thus, while it is true that DCFS did not implement visits in Los Angeles until February 2019, when it secured a monitor to transport minor to Los Angeles monthly, the evidence indicates that mother was aware that she could schedule weekly visits in Lancaster with advance notice so that a monitor could be ensured.  DCFS made a good faith effort to overcome any obstacles to visitation.  (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 973.)

II.  *The ICWA inquiry was deficient*

"The ICWA, enacted by Congress in 1978, is intended to 'protect the best interests of Indian children and to promote the stability and security of Indian tribes and families.'  [Citation.] 'The ICWA presumes it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations, a most important

resource.' [Citation.]" (*In re Karla C.* (2003) 113 Cal.App.4th 166, 173–174.)

Thus, the juvenile court and DCFS "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . has been filed, is or may be an Indian child." (§ 224.2, subd. (a).) The initial duty to inquire includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b); see also Cal. Rules of Court, rule 5.481(a); *In re D.F.* (2020) 55 Cal.App.5th 558, 566–567.)

"Just as notice to Indian tribes is central to effectuating ICWA's purpose, an adequate investigation of a family member's belief a child may have Indian ancestry is essential to ensuring a tribe entitled to ICWA notice will receive it." (*In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 787.) "ICWA and state law place the duty with the child protective agency in the first instance, not the child or his or her parent, to determine whether additional information exists that may link a child with Indian ancestry to a federally recognized tribe." (*Ibid.*)

"'The ICWA confers on tribes the right to intervene at any point in state court dependency proceedings. [Citations.] "Of course, the tribe's right to assert jurisdiction over the proceeding or to intervene in it is meaningless if the tribe has no notice that the action is pending." [Citation.] "Notice ensures the tribe will be afforded the opportunity to assert its rights under the [ICWA] irrespective of the position of the parents, Indian custodian or state agencies." [Citation.]' [Citation.]" (*In re Karla C., supra,*

113 Cal.App.4th at pp. 173–174; see also *In re H.A.* (2002) 103 Cal.App.4th 1206, 1210.)

As DCFS concedes, it did not conduct an adequate investigation into minor's potential Indian ancestry. (See, e.g., *In re D.S.* (2020) 46 Cal.App.5th 1041, 1053; *In re K.R.* (2018) 20 Cal.App.5th 701, 709 ["a social services agency has the obligation to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status"].) After all, when minor was detained in February 2018, the paternal grandmother disclosed that she had possible "Blackfoot" ancestry. Without any follow-up by DCFS, the juvenile court found that it had no reason to know minor was an Indian child under the ICWA. Thereafter, DCFS reported that the ICWA did not apply. And, DCFS never inquired further of the paternal grandmother regarding minor's possible connection to the Blackfeet tribe.

DCFS's breach of its duty and the juvenile court's failure to ensure compliance require a conditional reversal of the order terminating mother's parental rights and a remand for an adequate investigation of minor's Indian ancestry, with directions depending upon the outcome of that investigation. If after an inquiry it is determined that minor has no Indian ancestry, then the order terminating parental rights can be reinstated. (*In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1413–1414.)

However, if after an inquiry it is determined that a tribe must be given notice of these proceedings, then DCFS shall satisfy the ICWA's notice requirements. If after the tribe receives proper notice under the ICWA, minor is determined not to be an Indian child and the ICWA does not apply, the order terminating

35

parental rights can be reinstated.  (*In re Antoinette S.*, *supra*, 104 Cal.App.4th at pp. 1413–1414.)

## DISPOSITION

The juvenile court's finding that DCFS provided mother with reasonable reunification services is affirmed.  The order terminating mother's parental rights to minor is conditionally reversed and the matter is remanded to the juvenile court for full compliance with the inquiry and, if appropriate, notice provisions of the ICWA and related California law.  If minor is determined not to be an Indian child, the order terminating parental rights shall be reinstated.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
HOFFSTADT